# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Douglas Schmid,

                        Plaintiff,

                                      Civ. No. 06-669 (RHK/AJB)

                                      **MEMORANDUM OPINION**
                                      **AND ORDER**

v.

Sybaritic Inc.,

                        Defendant.

---

Sophia B. Andersson, James H. Kaster, Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff.

Thomas E. Marshall, Gina K. Janeiro, Jackson Lewis, LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Douglas Schmid has sued Defendant Sybaritic Inc. ("Sybaritic"), alleging that his employment was unlawfully terminated because of his age.[1]  Sybaritic now moves for summary judgment on the grounds that it terminated Schmid's employment because he was not able to perform the duties of his position and that age was not a factor in that decision.  For the reasons set forth below, the Court will grant Sybaritic's Motion.

## BACKGROUND

---

[1] Schmid was sixty-two years old when he was terminated.  (See Compl. ¶¶ 21-22; Schmid Dep. Tr. at 8.)

I.      **Schmid's Early Employment with Sybaritic**

On January 12, 1998, Schmid began working for Sybaritic as an Accounting Manager

and, shortly thereafter, became Sybaritic's Controller.  (Andersson Aff. Exs. A, B.)  In

February 2000, he was promoted to CFO/Vice President.  (Id.; Andersson Aff. Ex. E;

Schmid Dep. Tr. at 82-83.)  In each of these positions, Schmid reported to Sybaritic's then-

President and CEO, David Appelhof.  (Appelhof Dep. Tr. at 13.)  During this period,

Schmid's job duties included, *inter alia*, preparing Sybaritic's monthly financial

statements, issuing weekly cash-flow forecasts, preparing the company's yearly audit and

financial review, and assisting management with the company's cost containment and profit

planning.  (Schmid Dep. Tr. at 61-62, 83, 162-63; Appelhof Dep. Tr. at 15; Andersson Aff.

Ex. F; Marshall Aff. Ex. 1r.)

In mid-2001, Appelhof retired as CEO and was succeeded by Randall Rivers, who

had previously been the CFO of another company.  (Appelhof Dep. Tr. at 7, 12, 16; Schmid

Dep. Tr. at 95.)  During his tenure as Sybaritic's CEO, Rivers became frustrated with

Schmid's work product, which he believed was not providing him with the information he

needed; as a result, he considered terminating Schmid.  (Appelhof Dep. Tr. at 17-18.)

Rivers discussed his frustrations with Steven Daffer, Sybaritic's President and owner, and

Appelhof, who at the time was working as a consultant for the company, but he did not

terminate Schmid's employment.[2]  (Id. at 7, 18.)

_____

[2] Nothing has been brought to the Court's attention to explain why, despite Rivers's
concerns, Schmid's employment was not terminated at the time.

In early 2003, Rivers left Sybaritic but was not immediately replaced. (Schmid Dep. Tr. at 134-35; S. Daffer Dep. Tr. at 32.) For the next several years Sybaritic did not employ a CEO and Schmid reported to Daffer and to George Mertikas, Sybaritic's COO. (Mertikas Dep. Tr. at 12-13; Chesley Dep. Tr. at 18.)

## II.     Sybaritic's 2005 Corporate Evaluation

From 2003 to 2005, while Sybaritic operated without a CEO, Schmid's work was not closely monitored because neither Daffer nor Mertikas had a sophisticated financial background.[3] (S. Daffer Dep. Tr. at 48; Mertikas Dep. Tr. at 19-20.) In early 2005, however, Sybaritic began to restructure its operations in an effort to "grow the company and become more efficient." (Mertikas Dep. Tr. at 16.) To that end, in January 2005, Daffer hired his son, Anthony ("Tony") Daffer, an experienced businessman with a background in operations, and Steven Chesley, an experienced businessman with a background in finance,

---

[3] Despite his limited financial background, Daffer did observe several performance-related problems with Schmid's work, including: (1) failure to produce financial reports following Daffer's request; (2) personal use of company frequent-flier miles over several years; and (3) operation of a private tax preparation service during work hours with company assets. (S. Daffer Dep. Tr. at 33-34, 36, 82-83; Schmid Dep. Tr. at 45-46, 97-99, 112-13; Appelhof Dep. Tr. at 21; Chesley Dep. Tr. at 95; Andersson Aff. Ex. S.) Daffer confronted Schmid about the frequent-flier miles and Schmid wrote a personal check to him for the value of the miles used. (Schmid Dep. Tr. at 114, 116-17; S. Daffer Dep. Tr. at 106-08.) Daffer accepted this payment with "restored confidence" in Schmid. (Andersson Aff. Ex. S.) As a result of his willingness to pay for the frequent-flier miles, Daffer believed that Schmid had "already [reached] the point of being contrite with [him]" and he did not confront Schmid about the other performance problems he had observed. (S. Daffer Dep. Tr. at 85.)

to assess Sybaritic's business operations.[4]  (Chesley Dep. Tr. at 8, 16, 19; A. Daffer Dep.

Tr. at 10-11; Schmid Dep. Tr. at 129-30.)  Tony Daffer and Chesley met with many of

Sybaritic's employees, including Schmid, to learn about and assess the company's business

operations.  (Chesley Dep. Tr. at 15-16; A. Daffer Dep. Tr. at 16.)  After completing their

evaluation of Sybaritic's business operations, they drafted a document entitled "Business

Assessment, January '05" (the "Business Assessment"), which identified Sybaritic's

strengths, weaknesses, and future business opportunities.  (A. Daffer Aff. ¶ 3, Ex. A.)  The

Business Assessment listed several weaknesses in the "Finance/Operations" department,

including:

- Budgeting process does not exist.
- Weak or nonexistent departmental reporting system or processes.
- Cash reserves are wholly inadequate.
- Lack of accurate revenue forecasting tools/processes.
- Ineffective purchasing and product inventory procurement planning, processes, communication, and management.
- Lack product cost reduction and gross margin improvement plans.
- [Deficiencies in] company security.

(A. Daffer Aff. Ex. A.)

   In March 2005, following the completion of the Business Assessment and after

further evaluation of the company, Tony Daffer and Chesley prepared the 2005 Department

Tactical Objectives (the "DTO"), a document outlining the strengths and weaknesses of

_____

   [4] Tony Daffer had previously been a general partner and a member of the operating
committee at a small company for six years.  (A. Daffer Dep. Tr. at 6-10.)  Chesley has an
MBA and, before he joined Sybaritic, was the general manager of a 225-employee company
for thirteen years, where he was responsible for the company's financial reporting and
managing the company's overall operations.  (Chesley Dep. Tr. at 8-10.)

each department and containing recommendations to improve the functioning of each. (A.

Daffer Aff. ¶ 6, Ex. B.) During the analysis leading to the DTO, Chesley determined that

the financial reports that Schmid was preparing were "severely outdated, inaccurate, and . . .

just flat out wrong." (Chesley Dep. Tr. at 39.) To improve the accuracy of future reports,

Tony Daffer and Chesley recommended several changes to the Accounting/Finance

Department in the DTO including:

- Develop and implement budgeting process.
- Develop and implement reports as requested by Sales Dept.
- Implement expense/invoice approval process.
- Establish and enforce a formal revenue recognition policy.
- Establish and update internal control policies for check signing, wire transfers, etc.
- Develop new corporate financial statements.
- Hire Controller.

(A. Daffer. Aff. Ex. B.)

Shortly after they created the DTO, Tony Daffer and Chesley were promoted to Vice

President of Marketing and Vice President of Finance and Operations, respectively, and

assigned the task of implementing the DTO's recommendations. (Chesley Dep. Tr. at 13,

18-19; A. Daffer Dep. Tr. at 12-15.) As a result of these promotions, Chesley became

Schmid's immediate supervisor. (Chesley Dep. Tr. at 11; Schmid Dep. Tr. at 139.) Shortly

thereafter, Chesley concluded that the reports Schmid had produced demonstrated that he

"didn't understand some of the financial reporting methods" that Sybaritic was adopting and

that he "didn't have the knowledge, the background or the general understanding of finance

and accounting" to be the CFO following implementation of the recommendations in the

DTO.  (<u>Id.</u> at 42-44.)  In March 2005, he brought his concerns to Tony Daffer, and together

they determined that Schmid needed to be replaced.  (<u>Id.</u> at 40-42; A. Daffer Dep. Tr. at 38-

40; Mertikas Dep. Tr. at 32.)  Chesley and Tony Daffer then discussed this decision with

Steve Daffer and Mertikas, each of whom concurred.  (Chesley Dep. Tr. at 40, A. Daffer

Dep. Tr. at 31-32, Mertikas Dep. Tr. at 31-32, 39; S. Daffer Dep. Tr. at 56, 58-60.)

## III.    Sybaritic Terminates Schmid's Employment

Although Sybaritic did not immediately communicate to Schmid its decision to

replace him because it first wanted to hire his replacement, Chesley began to assign several

of Schmid's responsibilities to other employees.  (Chesley Dep. Tr. at 17, 19, 23-26;

Schmid Dep. Tr. at 143-46; A. Daffer Dep. Tr. at 43.)  In March or April 2005, Sybaritic

began a search for Schmid's replacement.  (Chesley Dep. Tr. 47, 52-53.)  In April 2005,

after interviewing several candidates, Sybaritic offered the newly created Controller

position to Jason Opsahl, a thirty-five-year-old financial analyst/accountant employed by a

small software company; initially, Opsahl did not accept the position because he was

interested in another position with a different company.  (Chesley Dep. Tr. at 75, 77-79;

Mertikas Dep. Tr. at 84; A. Daffer Dep. Tr. at 72; Kretlow Aff. ¶ 6.)  However, he was not

offered that position and, in August 2005, he expressed continued interest in working for

Sybaritic.  (<u>Id.</u> at 78-79.)  Sybaritic then hired Opsahl as its Controller, and he began his

employment with Sybaritic in September 2005.  (Mertikas Dep. Tr. at 84-85; Chesley Dep.

Tr. at 78.)

On September 7, 2005, shortly after Opsahl was hired but before he began working for Sybaritic, Tony Daffer and Chesley met with Schmid in his office and asked him to resign. (Chesley Dep. Tr. at 62-63; A. Daffer Dep. Tr. at 43-48; Schmid Dep. Tr. at 155-56, 158-62.) Schmid alleges that Tony Daffer opened the meeting by saying: "I'll get right to the point. You served my father well for many years. But we've hired a younger person to replace you who is more of a financial analyst. I'm asking you to resign."[5] (Schmid Dep. Tr. at 159.) In response, Schmid requested the opportunity to finish the week, which was granted. (Id.; A. Daffer Dep. Tr. at 46.) He was then offered a severance package in exchange for his resignation, but did not accept it at the time. (Schmid Dep. Tr. at 166-67; Chesley Dep. Tr. at 64-65; A. Daffer Dep. Tr. at 45-46.) The entire meeting lasted less than fifteen minutes. (A. Daffer Dep. Tr. at 43; Schmid Dep. Tr. at 159.)

On September 9, 2005, Schmid's final day with Sybaritic, Mertikas provided him with a formal severance offer and gave him twenty-one days to consider it. (Schmid Dep. Tr. at 166; Mertikas Dep. Tr. at 88-89, Ex. 8.) On September 14, 2005, Schmid met with Steven Daffer, Mertikas, and Appelhof to discuss the severance package and, at that time, Schmid was offered a consulting position with Sybaritic. (Schmid Dep. Tr. at 169-70; S. Daffer Dep. Tr. at 69-72; Appelhof Dep. Tr. at 33-40.) For the next several weeks, Schmid and Sybaritic negotiated the terms of a potential severance/consulting agreement. (Schmid

---

[5] Tony Daffer and Chesley each deny that this statement was made, although they admit telling Schmid that they had hired his replacement. (A. Daffer Dep. Tr. at 44-45; Chesley Dep. Tr. at 65, 67.) For purposes of the pending motion, the Court accepts Schmid's recitation of what was said.

Dep. Tr. at 170-186.)  Ultimately, Schmid rejected the severance/consulting agreement.

(Andersson Aff. Ex. W; Schmid Dep. Tr. at 177.)

On February 21, 2006, Schmid filed the instant action, alleging that his employment

was terminated because of his age; Sybaritic now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences favorable to the

non-moving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Cattrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50  (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the non-

moving party.  See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir.

2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The non-

moving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## ANALYSIS

The ADEA and the MHRA each forbid an employer from taking adverse employment actions against an employee because of age.  29 U.S.C. § 623(a)(1); Minn. Stat. § 363A.08. To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove the claim through circumstantial evidence. See Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003).[6]  Here, Schmid purports to offer both direct and circumstantial evidence of age discrimination.

**I.      Direct Evidence**

Schmid contends that Tony Daffer's statements to him that **"**[y]ou served my father well for many years" and "we've hired a younger person to replace you who is more of a financial analyst" are direct evidence of age discrimination.[7]  (Mem. in Opp'n at 9.)  Direct evidence of employment discrimination is evidence that establishes "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)).  Direct evidence consists of "conduct or statements by persons involved in the

_____

[6] Age discrimination claims under the MHRA are analyzed in the same fashion as claims under the ADEA.  Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003).

[7] In his statement of facts, Schmid also alleges that, after Chesley had reassigned several of his responsibilities to other workers, Mertikas told him that several of his own responsibilities had been reassigned to other employees and that "Daffer . . . wants the young guys to have more responsibility."  (Mem. in Opp'n at 4; Schmid Dep. Tr. at 149.) Schmid, however, does not rely on this statement in his argument.

decisionmaking process that may be viewed as directly reflecting the alleged

discriminatory attitude . . . sufficient to permit the factfinder to find that the attitude was

more likely than not a motivating factor in the employer's decision." Browning v.

President Riverboat Casino-Mo., Inc., 139 F.3d 631, 634 (8th Cir. 1998) (citations

omitted).

 In the instant case, Tony Daffer's statements do not constitute direct evidence of age

discrimination.  A statement that simply refers to an employee's protected status, but fails

to express any bias against the employee because of that status, is insufficient, standing

alone, to provide direct evidence of discrimination.  Cf. Price Waterhouse v. Hopkins, 490

U.S. 228, 277 (1989) (O'Connor, J., concurring) ("Race and gender always 'play a role' in

an employment decision in the benign sense that these are human characteristics of which

decisionmakers are aware and about which they may comment in a perfectly neutral or

nondiscriminatory fashion").  Here, Tony Daffer made the neutral statement that Schmid's

replacement was younger than him; this is not evidence that age "actually motivated"

Sybaritic's decision to terminate Schmid's employment.  In other words, Tony Daffer's

statements provide no evidence that Schmid's employment was terminated *because of* his

age.

 Schmid relies upon several Eighth Circuit decisions to support his argument that

Tony Daffer's comment that Schmid's replacement was "younger" than him is direct

evidence of age discrimination.  (Mem. in Opp'n at 10.)  Unlike the instant case, however,

each of those cases involved a statement or statements demonstrating that age was a

motivating factor in the employment decision.  See Hartley v. Dillard's, Inc., 310 F.3d

1054, 1059 (8th Cir. 2002) (statement by operations manager that Vice President told her

to "*go out and hire* some young guys" direct evidence of discrimination) (emphasis

added); Kneibert v. Thomson Newspapers, Mich. Inc., 129 F.3d 444, 452 (8th Cir. 1997)

(statement that newspaper manager had "no use for a senior editor" and, instead, *needed*

"three young editors" direct evidence of discrimination.)

Schmid also relies on Williams v. Valentec Kisco, Inc., 964 F.2d 723 (8th Cir.

1992).  In that case, the plaintiff's supervisor at a manufacturing facility complained to the

shop foreman that the plaintiff would not carry boxes and, instead, used a hand dolly to

move them.  Id. at 725-26.  In response, the shop foreman questioned "what [the plaintiff's

supervisor] was doing with an old man carrying boxes anyway."  Id. at 726.  The supervisor

then suspended the plaintiff from work, and he was terminated shortly thereafter.  Id.  In

analyzing the plaintiff's age-discrimination claim, the Court stated that under the facts of

that case, the shop foreman's comment "could fairly be considered as direct evidence" of

discrimination.  (Id. at 728.)

Williams, however, does not apply to the facts of the instant case, for several

reasons.  First, Williams was analyzed solely for circumstantial evidence of discrimination

under McDonnell Douglas, not for direct evidence of discrimination under Price

Waterhouse.  Second, in Williams, a reasonable fact-finder could have concluded that the

shop foreman's comment, which indicated his subjective opinion that Williams was "old"

rather than an objective fact that another individual was "younger," inferred his belief that

11

Williams could not perform his duties *because* he was "old." Tony Daffer's comment that

Schmid's replacement was "younger," however, provides no such inference that Schmid was

unable to perform his duties *because* of his age. Finally, Schmid's attempt to use <u>Williams</u>

to create a per se rule that comments referring to an employee's age provide direct

evidence of discrimination fails when viewed against Eighth Circuit precedent holding

otherwise. <u>See</u> <u>E.W. Blanch Co., Inc. v. Enan</u>, 124 F.3d 965, 970 (8th Cir. 1997)

(comment by corporate executive that employee selected to sit on board of directors was

"the right age" was not direct evidence of age discrimination); <u>cf.</u> <u>Brown v. McDonnell</u>

<u>Douglas Corp.</u>, 113 F.3d 139, 142 (8th Cir. 1997) (in a RIF case, supervisor's statement

that he "could have hired a young college graduate" at half plaintiff's salary not direct

evidence of discrimination); <u>Bialas v. Greyhound Lines, Inc.</u>, 59 F.3d 759, 763 (8th Cir.

1995) (in a RIF case, supervisor's description of plaintiff's replacement as "a young man"

did not infer age discrimination.)

      For these reasons, the Court concludes that Tony Daffer's comment that Schmid's

replacement was "younger" does not provide direct evidence of discrimination.

## II.    Circumstantial Evidence

### A.    Burden-Shifting Standard

      Where there is no direct evidence of discrimination, the familiar <u>McDonnell</u>

<u>Douglas</u> burden-shifting framework is applied. <u>Turner v. Honeywell Fed. Mfg. & Techs.,</u>

<u>LLC</u>, 336 F.3d 716, 720 (8th Cir. 2003) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792, 801-04 (1973)). Under this framework, the plaintiff has the initial burden of

establishing a *prima facie* case of discrimination.  Rothmeier v. Inv. Advisers, Inc., 85 F.3d

1328, 1332 (8th Cir. 1996) (citation omitted).  A minimal evidentiary showing will satisfy

this burden.  Turner, 336 F.3d at 720 (citation omitted).  Upon establishing a *prima facie*

case of discrimination, the burden shifts to the defendant to show that it had a legitimate,

nondiscriminatory reason for its actions.  "Once this burden has been met . . . the plaintiff

[must] prove that the proffered justification is merely a pretext for discrimination.  At all

times, the burden of persuasion remains with the plaintiff."  Pope v. ESA Servs., Inc., 406

F.3d 1001, 1007 (8th Cir. 2005) (citations omitted).

In the instant case, the Court assumes, *arguendo*, that Schmid has established a

*prima facie* case of age discrimination.  His claim still fails, however, because he has not

demonstrated that Sybaritic's proffered non-discriminatory reasons for terminating his

employment are pretextual.

**B.      Schmid's Failure to Establish Pretext**

In order to establish that Sybaritic's non-discriminatory reason for terminating his

employment is pretext, Schmid must demonstrate both that Sybaritic's articulated reason

for his termination is false and that discrimination was the real reason.  Wilking v. County

of Ramsey, 153 F.3d 869, 874 (8th Cir. 1998).  Sybaritic asserts that it terminated

Schmid's employment because it determined that he was unable to perform the duties of

CFO following the implementation of the recommendations of the DTO.[8]  (Mem. in Supp.

---

[8] Sybaritic has also offered Schmid's personal use of its frequent-flier miles and
company assets to support his private tax service as additional non-discriminatory reasons

13

at 25-26.)  Schmid presents several arguments in an attempt to demonstrate that this reason

is a pretext for discrimination.

Initially, Schmid points to his consulting offer from Sybaritic at the time of his

termination and a comment by Steven Daffer that he "could be an asset" to the company and

argues that this provides evidence that Sybaritic believed he was capable of performing the

duties of CFO.  (Mem. in Supp. at 18-19; S. Daffer Dep. Tr. at 69.)  This argument fails,

however, because Sybaritic's consulting offer and Steven Daffer's statement that Schmid

"could be an asset" to the company were each made under the assumption that Schmid

would be working in a different capacity.  (S. Daffer Dep. Tr. at 69-70.)  They do not,

therefore, present evidence that Sybaritic believed that Schmid could competently perform

the duties of CFO.[9]  Accordingly, the Court determines that Sybaritic's consulting offer to

Schmid and Steven Daffer's statement that he could be an asset to the company does not

establish that Sybaritic's non-discriminatory reason for terminating Schmid was pretextual.

---

for his termination.  (Mem. in Supp. at 12-13, 24-26.)  Schmid argues that these reasons
are pretextual because Steven Daffer discovered these incidents in August 2004, several
months before Sybaritic made the decision to terminate Schmid's employment in March
2005.  (Mem. in Opp'n at 17-18; S. Daffer Dep. Tr. at 82-83.)  Schmid further argues that,
because these reasons are pretextual, *none* of Sybaritic's non-discriminatory reasons are
"the real reason[] for Schmid's termination."  (Mem. in Opp'n at 18.)  While the Court
agrees that Sybaritic has not explained why it waited seven months to terminate Schmid's
employment after it discovered that he had used the company's frequent-flier miles and was
operating a private business from his company office, its failure to do so does not establish
that Schmid's inability to perform the duties of CFO is pretextual.

[9] The Court also notes that Sybaritic's offer of a consulting position to Schmid
following his termination appears to *weaken* his argument that age played a factor in the
decision to terminate his employment because it demonstrates that despite his age,
Sybaritic desired Schmid's services, albeit in a different capacity.

14

Schmid also argues that Chesley's and Tony Daffer's conclusion that Schmid could not perform the duties of CFO was pretextual because they had not worked long enough at Sybaritic to become familiar with his work product. (Mem. in Opp'n at 19.) Specifically, Schmid argues that the decision to terminate his employment was made in December 2004, several days after Tony Daffer and Chesley were hired to assess the company. (Id.) To support this argument, Schmid points to Appelhof's "guess" that he began searching for Schmid's replacement as early as December 2004. (Mem. in Opp'n at 19; Appelhof Dep. Tr. at 24.) Applehof testified, however, that it may have been December 2004, or January/February 2005 when he began searching for Schmid's replacement and that he "[didn't] know the exact dates." (Id.) And, Tony Daffer and Chesley each asserted that they decided to terminate Schmid's employment in late February or March, several months after they began their assessment of the company. (A. Daffer Dep. Tr. at 42; Chesley Dep. Tr. at 40-41, 63.) Appelhof's "guess" does not dispute this testimony and, as stated above, Schmid has presented no additional evidence that Sybaritic decided to replace him prior to February/March 2005.

Furthermore, the record indicates that Tony Daffer and Chesley were familiar with Schmid's work product when they decided to replace him in February/March 2005. Chesley testified that he determined during his evaluation of the company that Schmid's reports were "severely outdated, inaccurate, and . . . just flat out wrong." (Chesley Dep. Tr. at 39.) Tony Daffer and Chesley also reported numerous finance department deficiencies in both the Business Assessment and the DTO. These undisputed facts demonstrate that

15

Tony Daffer and Chesley were familiar with Schmid's work product when they decided to replace him. Accordingly, Schmid has failed to establish that his inability to perform the duties of CFO following the implementation of the recommendations of the DTO was pretextual because Tony Daffer and Chesley were unfamiliar with his work product when they decided to replace him.

Finally, Schmid argues that Sybaritic's reliance on his inability to perform the duties of CFO was a pretext for discrimination because, in both the Business Assessment and the DTO, the criticisms of other departments appear more extensive than the shortcomings of the finance and operations department, yet Schmid was the only department head who was terminated following the implementation of the recommendations in the DTO. (Mem. in Opp'n at 19.) Schmid, however, provides no evidence that the other department heads were either younger than him or that they were unable to perform the duties of their positions, as Chesley had concluded Schmid was unable to do. Accordingly, the fact that Schmid was the only department head terminated after the Business Assessment and DTO does not provide evidence of pretext.

For the reasons stated above, the Court determines that Schmid has not presented direct evidence of age discrimination or evidence that demonstrates that Sybaritic's reasons for terminating his employment were pretextual. Accordingly, the Court will grant Sybaritic's motion for summary judgment.

**CONCLUSION**

16

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**ORDERED** that Sybaritic's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**

and Plaintiff Douglas Schmid's Complaint (Doc. No. 1) is **DISMISSED WITH**

**PREJUDICE**.

       **LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: April 13 , 2007             s/Richard H. Kyle
                                      RICHARD H. KYLE
                                      United States District Judge